CLERKS OFFICE US DISTRICT COURT
AT ABINGDON, VA
FILED

October 21, 2024
LAURA A. AUSTIN, CLERK
BY: /s/ Robin Bordwine
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **SARAH BETH REYNOLDS,** | ) | |
| Plaintiff | ) | Civil Action No. 1:24cv00016 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MARTIN J. O'MALLEY,** | ) | |
| **Commissioner of Social Security,** | ) | By:  PAMELA MEADE SARGENT |
| Defendant. | ) | United States Magistrate Judge |
| | ) | |

### I. Background and Standard of Review

Plaintiff, Sarah Beth Reynolds, ("Reynolds"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may

be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Reynolds protectively filed an application for SSI[1] on October 25, 2021, alleging disability as of October 25, 2021,[2] due to chronic

_____

[1] Reynolds previously filed an application for SSI on January 9, 2017, alleging disability beginning July 31, 2015. (R. at 73.) By decision dated January 22, 2019, the ALJ denied her claim. (R. at 73-88.) The 2019 ALJ decision also references a fully favorable 2002 decision and a 2015 unfavorable ALJ decision. (R. at 83.)

Pursuant to the Fourth Circuit's opinion in *Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4th Cir. 1999), and in accordance with Social Security Acquiescence Ruling, ("A.R.") 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same … title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence" and consider its persuasiveness in light of all relevant facts and circumstances. A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 142361 (Aug. 1, 1991). Pursuant to A.R. 00-1(4), the ALJ must consider prior ALJ findings using factors articulated in *Albright* such as (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period under consideration in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim. *See* A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 142361 (Aug. 1, 1991).

The ALJ in this case correctly articulated the *Albright* standard when analyzing the prior ALJ decision. The ALJ afforded substantial weight to the findings of the record in relation to work activity, severity, listing evaluation and the ability to perform other work in the national economy because the ALJ found those findings to be well-supported by the evidence of record. (R. at 32.) The ALJ found that the evidence received at the hearing warranted finding additional severe impairments and additional residual functional capacity restrictions based on diagnostic evidence of record. (R. at 32.) However, the ALJ found that some residual functional capacity findings were not supported by evidence of record, and he did not include them. (R. at 32.) The ALJ gave substantial weight to the findings made in the prior decision, explaining that the record reflects minimal to no changes in the claimant's condition. (R. at 32.)

diarrhea, severe asthma, thyroid issues and learning disabilities. (Record, ("R."), at
20, 213, 215-20, 319.) The claim was denied initially and on reconsideration. (R. at
118-19, 130, 136.) Reynolds requested a hearing before an administrative law
judge, ("ALJ"). (R. at 138.) A hearing was held on June 2, 2023, at which
Reynolds was represented by counsel. (R. at 40-69.)

By decision dated August 8, 2023, the ALJ denied Reynolds's claim. (R. at
20-34.) The ALJ found Reynolds had not engaged in substantial gainful activity
since October 25, 2021, the application date. (R. at 23.) The ALJ determined
Reynolds had severe impairments, namely, irritable bowel syndrome, ("IBS"), with
diarrhea; asthma; environmental allergies; obstructive sleep apnea; obesity; and
borderline intellectual functioning, but he found Reynolds did not have an
impairment or combination of impairments that met or medically equaled one of
the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23-26.)

The ALJ found Reynolds had the residual functional capacity to perform
light[3] work, except she could frequently climb ramps and stairs and balance, stoop,
kneel, crouch and crawl; she could occasionally climb ladders, ropes or scaffolds;
she must avoid concentrated exposure to extreme heat, humidity, fumes, odors,
dusts, gases, poor ventilation and other pulmonary irritants, and hazards; she was
limited to work involving only simple, routine tasks with no more than occasional

[2] Reynolds initially alleged a disability onset date of January 17, 2019, but amended it at
her hearing to October 25, 2021, her protective filing date. (R. at 20, 215.)

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent
lifting or carrying of objects weighing up to 10 pounds. If someone can perform light work, she
can also perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2023).

changes in the work setting, with no strict production or pace requirements; and she could have no more than occasional interaction with supervisors, co-workers and the public. (R. at 26.) The ALJ found Reynolds had no past relevant work. (R. at 32.) Based on Reynolds's age, education, work history, residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Reynolds could perform, including the jobs of a garment folder, a marker and a clothing bagger. (R. at 32-33.) Thus, the ALJ concluded Reynolds was not under a disability as defined by the Act, since October 25, 2021, the date the application was filed, and she was not eligible for SSI benefits. (R. at 33-34.) *See* 20 C.F.R. § 416.920(g) (2023).

After the ALJ issued his decision, Reynolds pursued her administrative appeals, (R. at 210-11, 407-09), but the Appeals Council denied her request for review. (R. at 7-11.) Reynolds then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2023). This case is before this court on Reynolds's brief filed June 6, 2024, and the Commissioner's brief filed July 22, 2024.

*II. Facts*

Reynolds was born in 1988, (R. at 215), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c). She has a high school education. (R. at 32.) Reynolds has no past relevant work, but testified that she took 40 hours of personal care assistant, ("PCA"), training, and she worked very briefly as a PCA while in her training program. (R. at 51-52, 328-30.) Reynolds testified that she had to quit the PCA program due to her asthma and Crohn's disease, because she could not

work around pet dander, body odors or fragrances. (R. at 51.) Reynolds testified that she lived with her parents, who did all of the grocery shopping and the household chores. (R. at 52-54.)  Reynolds testified that it was hard for her to go to the store, and she did not go out with friends due to the symptoms of her diarrhea and asthma. (R. at 53.)

Reynolds testified that most days, she sat in her bed for six hours a day with a fan blowing on her because she could not go outside without having an asthma attack. (R. at 52.) Reynolds testified that she used a nebulizer four times a day and a rescue inhaler two to three times per day. (R. at 55.) Reynolds testified that she "can't do anything" for 30 to 40 minutes after using her nebulizer or rescue inhaler because she got very jittery. (R. at 55.) Reynolds testified that she would lie down and try to keep herself calm. (R. at 58.) Reynolds testified that her heart rate usually was elevated to 120 or 150 at the doctor's office, which she attributed to her asthma. (R. at 55.) Reynolds testified that in the previous six months, she had received three Decadron[4] shots for her asthma, which gave her a migraine headache and interfered with her sleep. (R. at 56.) Reynolds testified that she planned to start a new asthma medication, Tezspire, because the Decadron shots were not relieving her symptoms. (R. at 58-59.)

Reynolds testified that she has diarrhea two to four days per week and that it could occur eight to 10 times in an eight-hour period. (R. at 53.) Reynolds testified that during these periods, she had to stay in bed with chills and cold sweats. (R. at 53.) Reynolds testified that stress, nervousness, distress and certain foods triggered

---

[4] While Reynolds's testimony indicates that she was on Decadron shots, her medical records show that she was receiving Dupixent shots, an asthma and eczema injection. (R. at 424.)

her symptoms. (R. at 57.) Reynolds testified that she could not go out to eat for fear of symptoms, and that she had to make her own food to bring to family gatherings. (R. at 57.) Reynolds testified that she took Metformin for her blood sugar, which aggravated her symptoms. (R. at 57-58.) Reynolds testified that she took prednisone or she went to the doctor or the hospital to get antibiotics. (R. at 53.) Reynolds testified that she had to bring extra clothes with her when she went to the doctor, and the fear of not being able to control her symptoms in public prevented her from leaving the house. (R. at 53.)

Reynolds testified that she would get migraines at least two times per month, which would cause vomiting, diarrhea and light sensitivity. (R. at 54.) Reynolds testified that they typically lasted two to three days, and occasionally she would have to get a shot for relief. (R. at 54.) Reynolds testified that she previously had taken Maxalt and other migraine medications, but they either made her drowsy or did not work effectively, so she currently was not taking any medications. (R. at 56-57.)

Reynolds testified that she had to frequently take prednisone, which elevated her blood sugar, and she was unable to take prescribed metformin for her blood sugar because it worsened her diarrhea. (R. at 56.) Reynolds testified that her blood sugar was, currently, 127. (R. at 56.) Reynolds also testified that she had hypothyroidism, which caused her to be fatigued, and she said she could walk for 10 to 15 minutes at a time before needing to rest at least 20 to 30 minutes. (R. at 59-60.) Reynolds testified that if she lifted or pulled for more than 10 to 15 minutes, she would have an asthma attack. (R. at 60-61.) Reynolds testified that she could carry a five-pound bag of sugar, but not for very long, and she could not

bend, stoop, squat or kneel because it would cause her to have an asthma attack. (R. at 61.) Reynolds testified that she experienced left shoulder pain and had previously cracked a rib from coughing due to her asthma. (R. at 61-62.)

In rendering his decision, the ALJ reviewed records from Jo McClain, Psy. D., a state agency psychologist; Joseph Leizer, Ph.D., a state agency psychologist; Dr. Robert McGuffin, Jr., M.D., a state agency physician; Dr. Bert Spetzler, M.D., a state agency physician;  Pikeville Medical Center; The Health Wagon; St. Mary's Clinic; Holston Medical Group; Cutting Edge Dermatology; Eastside High School; Ballad Health; Norton Community Hospital; and Community Physicians Pulmonology.

On October 27, 2021, Reynolds had a telehealth appointment with Christopher J. Ratliff, F.N.P., a nurse practitioner at The Health Wagon, for a follow up. (R. at 426.) Reynolds reported pain and a rash under her breast and nerve pain in her hands and legs. (R. at 426.) Ratliff prescribed nortriptyline. (R. at 428.)

On November 4, 2021, Reynolds saw Ratliff for breathing problems. (R. at 424.) The appointment notes for this visit list only Reynolds's medications, indicating that she was receiving Dupixent injections every two weeks; she was taking Zofran once daily; she was taking alosetron twice daily; she was using albuterol in a nebulizer every eight hours and in a rescue inhaler as needed or every six hours; she was using a Glucometer twice daily; she was taking Protonix once daily; she was taking magnesium oxide once daily as needed; she was taking levothyroxine once daily; she was taking Singulair once daily; she was using

Flonase once daily; she was taking lisinopril once daily; she was using a Symbicort inhaler twice daily; she was using nystatin powder twice daily; and she was taking nortriptyline once daily. (R. at 424.)

On January 11, 2022, Reynolds saw Dr. Brian Easton, M.D., a primary care provider at Holston Medical Group, for right ear pain that had begun four days previously and was accompanied by sinus congestion, chronic diarrhea and right-sided gum pain. (R. at 514.) Dr. Easton prescribed antibiotics for a suspected tooth abscess. (R. at 514.)

On January 25, 2022, Reynolds saw Dr. Easton with complaints of allergy symptoms. (R. at 508.) Reynolds reported that her diabetes, weight, asthma and hypertension were stable. (R. at 508.) Reynolds reported exacerbated allergy symptoms and stated that she had been around hay and animals. (R. at 508.) Dr. Easton prescribed prednisone for an allergy exacerbation and refilled Reynolds's albuterol, Symbicort, Protonix, lisinopril, levothyroxine, Flonase and Singulair. (R. at 511-12.)

On January 26, 2022, Reynolds was sent a result letter for lab work collected by Holston Medical Group. (R. at 505.) The letter indicated that Reynolds's A1c was 6.1 percent, and her blood glucose was 107, indicating prediabetes or controlled diabetes. (R. at 505-06.) Reynolds had mildly elevated liver enzymes and red blood cell count, but the lab work was noted as "OK" by the interpreting provider. (R. at 505-07.)

On March 7, 2022, Reynolds saw Ratliff for suspected Covid-19 infection. (R. at 730.) Reynolds reported that she had not been feeling well since the previous weekend, when she was around secondhand smoke. (R. at 730.) Reynolds also reported congestion, fatigue, sore throat and cough. (R. at 730.) Reynolds's Covid-19 test was negative, and she was prescribed an antibiotic. (R. at 731.)

On March 17, 2022, Reynolds saw Vanessa T. Salyer, F.N.P., a nurse practitioner, for an asthma follow up from her last visit with Dr. Raj, her previous pulmonary provider, who had last seen Reynolds more than one year prior. (R. at 639.) Reynolds complained of asthma exacerbation since her last visit one year ago that required prednisone and antibiotics. (R. at 639.) Reynolds reported that she had been out of her Symbicort inhaler due to insurance issues, which resulted in increased exacerbations. (R. at 639.) Reynolds was given samples of Breo Ellipta, an inhaler, and instructed to continue albuterol and Dupixent, avoid triggers and focus on diet and exercise. (R. at 643.) Salyer also noted that Reynolds was noncompliant with continuous positive airway pressure, ("CPAP"), obstructive sleep apnea. (R. at 643.) After discussing the risks associated with untreated obstructive sleep apnea, Reynolds made an informed decision to decline therapy. (R. at 643.)

On May 3, 2022, Reynolds saw Salyer for a follow up. (R. at 647.) Reynolds reported that she could not take Breo Ellipta due to headache, and Salyer prescribed Advair, an inhaler. (R. at 651.) Salyer noted that Reynolds's current medical regiment was effective. (R. at 652.)

On August 5, 2022, Reynolds contacted Dr. Easton to request a thyroid panel. (R. at 657.) Reynolds reported more frequent migraines and was worried that her hypothyroidism was not controlled. (R. at 657.) Reynolds also reported sinus congestion, drainage and cough. (R. at 657.) Dr. Easton ordered a comprehensive metabolic panel, a blood glucose panel and a thyroid panel. (R. at 661-62.) The lab results indicated that Reynolds's A1c was 6.4, and her blood glucose was 137. (R. at 666.) Reynolds's thyroid stimulating hormone levels were too high, likely due to her medication dose, and she was instructed to decrease her levothyroxine dose and recheck her levels in six weeks. (R. at 792.)

On August 25, 2022, Reynolds had a routine follow up with Salyer. (R. at 675.) Reynolds reported sinus pain and congestion, and she requested antibiotics. (R. at 675.) Salyer prescribed an antibiotic and recommended saline nasal spray. (R. at 679.) Salyer noted that Reynolds's asthma was well-controlled on Dupixent, and she encouraged her to follow a healthy diet and lifestyle. (R. at 679.) X-ray imaging of the chest, completed on September 15, 2022, showed negative findings. (R. at 681.)

On October 7, 2022, Reynolds saw Dr. Easton for upper respiratory infection symptoms that had begun two days previously. (R. at 783.) Reynolds complained of cough, fever, body aches, chills, sore throat, ear pain, runny nose, congestion and shortness of breath, and she denied vomiting, diarrhea and chest pain. (R. at 783.) Reynolds reported a recent exposure to her niece who was sick, and she said that over-the-counter medications were not alleviating her symptoms. (R. at 783.) Physical examination was positive for bilateral maxillary sinus

tenderness. (R. at 786.) Reynolds was diagnosed with Covid-19 and acute sinusitis, and she was instructed on supportive care. (R. at 786-87.)

On November 17, 2022, Reynolds saw Dr. Easton for a follow up and left shoulder pain. (R. at 765.) Dr. Easton noted that Reynolds's type 2 diabetes, asthma, hypertension and GERD were stable and managed by lifestyle, dietary measures, and/or medication (R. at 765.) Reynolds complained of left shoulder pain from overuse, and she also stated that she had been hit by the door of her truck and had bruising and worsened pain over the last two to three days. (R. at 766.) Dr. Easton prescribed a muscle relaxant and refilled Reynolds's medications. (R. at 769-71.)

On November 18, 2022, Reynolds received results of her recent lab work, which showed that her A1c was 6.7 and her average blood glucose was 146, but the remainder of her labs were acceptable, including a thyroid panel. (R. at 762-64, 774.)

On December 28, 2022, Reynolds saw a Dr. Autumn M. Starnes, D.O., a dermatologist, for a rash on her hands. (R. at 701.) Reynolds reported that her symptoms had lasted for many years, were not relieved by dermatitis cream, and caused her hands to crack and bleed. (R. at 701.) Reynolds was diagnosed with atopic dermatitis and told to avoid scented detergents and regularly moisturize her hands. (R. at 702.) Dr. Starnes also prescribed a topical steroid. (R. at 702.) On February 16, 2023, Reynolds followed up on her hand dryness, stating that, due to her work, she was required to frequently wash her hands. (R. at 706.) Reynolds

was instructed to continue to regularly moisturize her hands, avoid irritating agents, and use the topical steroid. (R. at 707-08.)

On January 25, 2023, Reynolds saw Mckenna Price, N.P., a nurse practitioner at Holston Medical Group, for a follow up. (R. at 761.) Reynolds complained of symptoms that had begun several days prior and were not alleviated by over-the-counter medications. (R. at 757.) Reynolds complained of body aches, chills, sore throat, headache, shortness of breath, ear pain, runny nose, congestion and cough, and she denied fever, chest pain, vomiting and diarrhea. (R. at 757.) Physical examination was positive for bilateral maxillary sinus tenderness. (R. at 759-60.) Price diagnosed acute sinusitis and prescribed an antibiotic. (R. at 760.)

On February 17, 2023, Reynolds saw Dr. Easton for a follow up. (R. at 751.) Dr. Easton noted that Reynolds's type 2 diabetes was stable with dietary management only, her asthma was stable, her hypertension was stable and blood pressure control was good, and her GERD was controlled with medications. (R. at 751.) Dr. Easton note that Reynolds recently had been initiated on doxycycline by her dermatologist. (R. at 752.) Physical examination was normal, and Reynolds's medications were refilled. (R. at 754.)

On February 27, 2023, Reynolds saw Salyer for an asthma follow up. (R. at 715.) Reynolds reported that she was having two to three asthma exacerbations a year, and her symptoms were triggered by springtime, floral scents and cigarette smoke exposure. (R. at 715.) Reynolds reported taking Symbicort, Dupixent, Singulair and Flonase, and stated that she was previously on Spiriva, which she wanted to try again. (R. at 715.) Reynolds reported having respiratory syncytial

virus, ("RSV"), two months previously that resolved with prednisone. (R. at 715.) Salyer prescribed antibiotics and prednisone for asthma exacerbations, and she prescribed Spiriva and refilled Reynolds's other asthma medications. (R. at 720.) Salyer noted that Reynolds's current medication regimen was effective, and she could continue her current management plan. (R. at 720.)

On April 26, 2023, Reynolds saw Dr. Easton for vomiting and diarrhea, stating that she been unable to consume liquids or Zofran since the previous night. (R. at 743.) Reynolds complained of vomiting, diarrhea, fever, body aches, chills, sore throat and ear pain, and she reported close contact with her nephew who had been sick with the stomach bug and strep. (R. at 743.) Reynolds stated that she felt like she was smothering, despite taking prednisone prescribed by her pulmonologist, and she reported an upcoming follow-up appointment with her pulmonologist on May 16, 2023. (R. at 743.) Physical examination was unremarkable. (R. at 745-46.) Strep and Covid-19 testing was negative, and Dr. Easton recommended that Reynolds consume more fluids. (R. at 747.)

On April 27, 2023, Reynolds saw Jared C. Tyhurst, O.D., an optometrist, for an eye examination. (R. at 736.) Reynolds reported occasional burning and aching sensations in her eyes and daily headaches. (R. at 736.) Reynolds was given a prescription for glasses and told to use artificial tears as needed. (R. at 736.) Dr. Tyhurst noted that there were no ocular finding that would prevent her from working in any capacity. (R. at 736.)

On May 16, 2023, Reynolds saw Salyer for an asthma follow up. (R. at 794.) Reynolds was noted to have moderate to severe persistent asthma, with

exacerbations that initially were reduced on Dupixent until six to 12 months previously, when her exacerbations increased to two to three times yearly that were worse in the spring and after exposure to floral scents and cigarette smoke. (R. at 794.) Salyer recommended that Reynolds switch to Tezspire injections and consider consultation with an allergist if her symptoms persisted, and she advised Reynolds to return in three months. (R. at 800.) Salyer noted that Reynolds's most recent exacerbation occurred the previous year. (R. at 807.)

On May 19, 2023, Reynolds saw Dr. Easton for a follow up. (R. at 809.) Dr. Easton noted that Reynolds's type 2 diabetes, asthma, hypertension and GERD were stable and managed by medication and/or lifestyle modifications. (R. at 809-10.) Physical examination was unremarkable, and Dr. Easton refilled Reynolds's medications. (R. at 813-15.) Lab work collected at this appointment showed an elevated A1c and blood glucose, but was, otherwise, normal, including a thyroid panel. (R. at 816-21.)

On May 4, 2022, Jo McClain, Psy.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Reynolds was mildly limited in her ability to interact with others and to adapt or manage herself; and moderately limited in the ability to understand, remember or apply information and to concentrate, persist or maintain pace. (R. at 99.) McClain also had completed a Mental Residual Functional Capacity evaluation on March 28, 2022, finding that Reynolds was moderately limited in one out three areas of understanding and memory; moderately limited in two out of eight areas of concentration and persistence; and she did not have social interaction or adaptation limitations. (R. at 101-02.) On August 4, 2022, Joseph Leizer, Ph.D., a state

-14-

agency psychologist, completed a PRTF and a Mental Residual Functional Capacity evaluation at the reconsideration level. (R. at 109-10, 112-13.) Leizer found that Reynolds was moderately limited in her ability to understand, remember or apply information and to concentrate, persist or maintain pace; and mildly limited in her ability to interact with others and to adapt or manage herself. (R. at 110.) Leizer also found that Reynolds was moderately limited in one out of three areas of understanding and memory; moderately limited in two out of eight areas of concentration and persistence; and she did not have social interaction or adaptation limitations. (R. at 112-13.)

On April 4, 2022, Dr. Robert McGuffin, M.D., a state agency physician, completed a Physical Residual Functional Capacity evaluation, finding that Reynolds would be limited to light work, except she could occasionally climb ladders, ropes and scaffolds; she could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl; and she should avoid concentrated exposure to extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation and hazards. (R. at 100-01.) On August 8, 2022, Dr. Bert Spetzler, M.D., another state agency physician, completed a Physical Residual Functional Capacity evaluation on reconsideration, which mirrored Dr. McGuffin's findings. (R. at 111-12.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2023). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires

the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a)(4) (2023).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Reynolds argues that the ALJ erred by failing to mention three medical appointments present in the record, and by improperly considering the August 2018 medical opinion of Rebecca Mullins, F.N.P.  (Plaintiff's Brief In Support Of Reversal Or Remand, ("Plaintiff's Brief"), at 4-6.)

Reynolds filed her application in October 2021; thus, 20 C.F.R. § 416.920c governs how the ALJ considered the medical opinions here.[5] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimant's medical sources. 20 C.F.R. § 416.920c(a) (2023). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. § 416.920c(b), (c)(1)-(5) (2023) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he considered those opinions or findings "individually." 20 C.F.R. § 416.920c(b)(1) (2023).

_____

[5] 20 C.F.R. § 416.920c applies to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. *See* 20 C.F.R. § 416.920c(b)(2). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 416.920c(c)(2). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[6] *See* 20 C.F.R. § 416.920c(b)(2).

A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. § 416.945(a) (2023). The ALJ found Reynolds had the residual functional capacity to perform light work, except she could frequently climb ramps and stairs and balance, stoop, kneel, crouch and crawl; she could occasionally climb ladders, ropes or scaffolds; she must avoid concentrated exposure to extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation and other pulmonary irritants and hazards; she was limited to work

---

[6] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 416.920c(b)(3) (2023).

involving only simple, routine tasks, with no more than occasional changes in the work setting, with no strict production or pace requirements; and she could have no more than occasional interaction with supervisors, co-workers and the public. (R. at 26.)

In making his residual functional capacity finding, the ALJ considered an August 20, 2018, Pulmonary Medical Source Statement by Rebecca Mullins, F.N.P., a nurse practitioner. (R. at 31.) Reynolds argues the ALJ improperly found Mullins's opinion unpersuasive. (Plaintiff's Brief at 6.) In her statement, Mullins indicated that she had seen Reynolds since November 2, 2017, for asthma and hypothyroidism. (R. at 410.) Mullins indicated that correlative clinical findings were an abnormal serum amylase, for which Reynolds saw her pulmonary provider, Cynthia Dean, F.N.P.; high red blood cell count; and high LDL cholesterol. (R. at 410.) Mullins indicated that Reynolds had shortness of breath, orthopnea, wheezing, episodic acute asthma, fatigue and coughing, and her acute asthma attacks were precipitated by upper respiratory infections, allergens, exercise, aspirin and/or tartazine, emotional upset and/or stress, irritants and cold air and/or change in weather. (R. at 410.) Mullins indicated that the nature and severity of Reynolds's asthma attacks were characterized by swollen bronchi, wheezing and the inability to breathe normally, she had approximately five asthma attacks per month, and she was incapacitated for approximately three days during the average attack. (R. at 410.) Mullins opined that emotional factors, specifically, panic, contributed to the severity of Reynolds's attacks. (R. at 410.) Mullins indicated that Reynolds was prescribed Singulair, an albuterol inhaler, a Symbicort inhaler, levothyroxine and ranitidine. (R. at 411.) Mullins indicated that Reynolds's prognosis was fair, but she experienced upset stomach, dizziness,

fatigue and drowsiness as side effects her medications. (R. at 411.) Mullins opined that Reynolds's impairments could be expected to last at least 12 months; she could walk one-half of a city block without rest or severe pain; she could sit for 20 minutes at one time; she could stand for 15 minutes at one time; she could sit and stand and/or walk a total of less than two hours in an eight-hour workday; she needed to take eight to 10 unscheduled, 10-to-15 minute breaks per workday; she could occasionally lift and carry less than 10 pounds and rarely lift and carry 10, 20 and 50 pounds; she could rarely twist, stoop, crouch and/or squat, climb ladders and climb stairs; she should avoid even moderate exposure to extreme cold and heat, high humidity and wetness; she should avoid all exposure to cigarette smoke, perfumes, soldering fluxes, solvents and/or cleaners, fumes, odors, gases, dust and chemicals; she would be off task for at least 25 percent of the day; she was incapable of even "low stress" jobs; her impairments were likely to produce "good days" and "bad days;" she would be absent from work for more than four days per month; and her impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation. (R. at 411-13.)

The record indicates that Reynolds saw Mullins on November 28, 2018, and January 8, 2019. (R. at 480-82.) At the November appointment, Mullins filled Reynolds's Singulair, levothyroxine, Symbicort inhaler, Proventil inhaler, Dexilant and Creon prescriptions. (R. at 480.) At the January appointment, Reynolds asked for assistance getting Medicaid to approve her medications, and Mullins prescribed antibiotics. (R. at 482.)

The ALJ correctly analyzed Mullins's opinion for supportability and consistency. After detailing Mullins's opinion, the ALJ noted that the opinion was

rendered more than three years prior to the amended alleged onset date, outside of the period at issue. (R. at 31.) The ALJ also found that the opinion was not supported by or consistent with the current evidence of record, which showed longitudinal examination findings that noted no physical deficits. (R. at 31.) Reynolds's argument that the ALJ improperly considered her residual functional capacity by failing to give more weight to Mullins's opinion is without merit. For the foregoing reasons, I find that substantial evidence supports the ALJ's consideration of Mullins's opinion.

Next, Reynolds argues that the ALJ erred by not specifically addressing three medical appointments present in the record. For the reasons that follow, I am not persuaded.

The first appointment, with Tonya Crawford, A.P.R.N., occurred in August 2018, nearly three years before the amended alleged onset date. At this appointment, Reynolds complained of intermittent episodes of diarrhea, that had begun three years prior, and consisted of diarrhea 14 to 15 times per day, including at night. (R. at 416.) Reynolds reported recent antibiotic use and that her episodes were mostly caused by stress and certain foods. (R. at 416.) At this appointment, Crawford recommended dietary and lifestyle modifications, such as a low-FODMAP[7] diet, and she ordered lab and stool studies, added Bentyl and recommended an esophagogastroduodenoscopy, ("EGD"), with small bowel

---

[7] A low-FODMAP diet is a short-term diet experiment to determine whether an individual with irritable bowel syndrome may be sensitive to particular foods. See med.virginia.edu/ginutrition/wp-content/uploads/sites/199/2023/12/Low-FODMAP-Diet-and-Instructions-2023.pdf (last visited Oct. 17, 2024.)

biopsies and a colonoscopy. (R. at 419.) There is no evidence in the record that Reynolds followed through with the recommended procedures. Additionally, Reynolds reported to her primary care team that she did not want to return to Crawford, and she wanted to initiate care elsewhere. (R. at 439, 449, 485, 589.)

Another appointment, a pulmonary function test, occurred in 2015. Reynolds argues that the ALJ's failure to make any mention of this breathing test constitutes an error. Reynolds argues that the "lung age" listed on this pulmonary function test shows a severe limitation, but the results of this testing indicated that Reynolds had only a mild limitation, while other results obtained that same day are within normal limits. (R. at 722, 724.) Reynolds also makes no mention of pulmonary function testing conducted in July 2020 that was "within normal limits," showing "[n]o obstructive or restrictive airway disease." (R. at 683.)  While a normal pulmonary function test does not rule out asthma, as noted by the interpreting physician, Reynolds's pulmonary providers consistently noted that her condition was controlled. (R. at 652, 675, 683.) At her hearing with the ALJ, by and through counsel, Reynolds amended her alleged onset date to October 25, 2021. (R. at 20.) Essentially, Reynolds alleges error where the ALJ did not consider two medical appointments that occurred years before the amended alleged onset date, which contained an initial work-up by a nurse practitioner, and a six-year-old pulmonary function test that showed, at most, a mild restriction in pulmonary function.

The last appointment, with Dr. Easton, was in August 2022, during the time period relevant to Reynolds's claim. In this appointment, Reynolds requested a thyroid panel, and she complained of sinus pressure lasting one week that was accompanied by headaches, cough and congestion. (R. at 657.) Reynolds lists the

diagnoses from this appointment and states that the ALJ "failed to make any mention of this office visit." (Plaintiff's Brief at 5.) Reynolds overstates the significance of this omission. Regarding Reynolds's Type II diabetes, Dr. Easton noted that her blood glucose was controlled below 130, and her diabetes was stable on diet control only without medications. (R. at 657.) Dr. Easton noted that Reynolds's weight management was stable, and he recommended risk factor modification, but noted that Reynolds was not following a diet and could not exercise due to asthma. (R. at 657.) Dr. Easton noted that Reynolds's asthma was stable, that she could continue her current medication and that her asthma pattern was classified as "moderate persistent." (R. at 657.) Regarding Reynolds's hypertension, Dr. Easton noted that her disease management was stable with no change to her treatment indicated, even though she had been out of her medication for the previous month. (R. at 657.) Lastly, Dr. Easton noted that Reynolds's GERD was stable, she was adherent to her medication regimen, and she was not experiencing chest or abdominal pain. (R. at 657.) Additionally, Reynolds no longer complained about headaches after her thyroid medication was adjusted, and her sinusitis was treated with antibiotics. (R. at 662.)

While the ALJ did not specifically discuss the above appointment in his decision, he references several other appointments with Dr. Easton, or nurse practitioners at his office, where Reynolds was diagnosed with the same conditions, such as January 25, 2022, March 10, 2022, and April 26, 2023, (R. at 28, 508, 618, 743-44.) By contrast, the ALJ did not include other appointments during the relevant time period where Dr. Easton assessed Reynolds with similar conditions, such as those on October 7, 2022, November 17, 2022, and May 19, 2023. (R. at 765, 783, 809-10.)

Reynolds argues that the ALJ "must consider all the evidence and explain on the record the reasons for his findings, including the reason for rejecting relevant evidence in support of the claim." *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980). Reynolds does not argue why *King* is inconsistent with the ALJ's analysis. As discussed above, the reviewing court "considers whether the ALJ examined all relevant evidence and offered a sufficient rationale in crediting certain evidence and discrediting other evidence." *Shelley C. v. Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 353 (4th Cir. 2023) (citing *Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 528 (4th Cir. 1998)). The ALJ is required to consider "all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017) (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). Reynolds does not present a compelling reason as to why any of the appointments at issue were relevant or pointed to a finding of disability. The 2015 pulmonary function test occurred during a previously adjudicated period and also was irrelevant in the presence of pulmonary function testing completed in 2020, which the ALJ discussed in his opinion. Similarly, Reynolds does not argue why the 2018 initial patient visit with Crawford was relevant or supported a claim of disability, when Reynolds experienced a significant asymptomatic period after that appointment, up to and through her amended alleged onset date. Lastly, Reynolds does not argue why the ALJ's failure to discuss the August 2022 appointment with Dr. Easton constitutes error. Reynolds also does not argue why that particular appointment's omission from the record constitutes error, but the omission of other, nearly identical appointments, does not. Indeed, the ALJ is not obligated to discuss every appointment present in the record, but instead, he must "build an

accurate and logical bridge from the evidence to [the] conclusion." *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)). For the reasons stated herein, I find that the ALJ met this obligation.

Based on this, I find substantial evidence exists to support the ALJ's consideration of the medical evidence in the record, as well as his residual functional capacity gfinding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists in the record to support the ALJ's consideration of the medical evidence;

2.  Substantial evidence exists to support the ALJ's finding regarding Reynolds's residual functional capacity; and

3.  Substantial evidence exists in the record to support the Commissioner's finding that Reynolds was not disabled under the Act and was not entitled to SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     October 21, 2024.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE